COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-180-CV

IN THE INTEREST OF 

B.C. AND O.C., CHILDREN

------------

FROM THE 325TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellants Anna C. and David Jason Worthington (“Jason”) appeal the trial court’s order terminating their parental rights to Anna’s son, B.C., and Anna and Jason’s daughter, O.C.  They each raise three issues challenging the legal and factual sufficiency of the evidence supporting the grounds for termination and the trial court’s findings that termination was in the children’s best interests.  We affirm.

BACKGROUND

Anna’s son, B.C., was born August 15, 2003.
(footnote: 2)  Jason and Anna met a few months later and were living together by March 2004.  On Saturday, November 6, 2004, Lydia Martinez, a relative of Anna,
(footnote: 3) went to Jason and Anna’s apartment to pick up B.C. and saw bruises on B.C.’s body.  Both Lydia and her husband, Juan, testified that they had begun to see fingerprints on B.C’s face a few months earlier.  Lydia testified that when she asked Jason about the bruises, he replied that if he had “done it,” the bruising would have been worse.  Juan called police and then also confronted Jason about the bruising; according to Lydia, Jason told Juan, “Okay, okay, I admit it.  I did it.”  Juan testified that Jason said he caused B.C.’s injuries because he wanted to “make the baby tougher.” 

Thereafter, Juan, Lydia, and Anna, who was pregnant at the time, took B.C. to the emergency room.  According to the emergency room doctor’s affidavit, B.C. was diagnosed with “multiple ecchymoses”
(footnote: 4) involving his face, arms, chest, and legs.  The doctor’s affidavit reported that the bruising pattern on B.C.’s face was “consistent with a hand slap mark and/or squeezing of the face.”  The other bruises were in atypical locations for a toddler, leading the doctor to conclude that the injuries appeared consistent with blunt force trauma in a non-accidental pattern.  The doctor also noted that B.C. had a tongue injury that was caused by forceful penetration of the mouth by an object such as a bottle, spoon, or finger.  Finally, the doctor observed that B.C. had apparently suffered progressively worse injuries over the preceding few days and concluded, “I fear the ultimate injury may occur that could lead to his demise.”

After receiving a report of possible abuse of a child, CPS investigator Norma Wolf responded to the hospital that same evening to assess B.C.’s situation.  Wolf testified that she observed bruises on B.C.’s face, head, ears, thighs, and arms.  Wolf further testified that she asked Anna about B.C.’s bruises, and Anna responded that she had seen Jason hit the child on an ongoing basis.  Anna also said that Jason had been physically and emotionally abusive to her as well.  Wolf testified that it was obvious to her that Anna knew that Jason had injured B.C. “not just once, probably several times over a long period,” because B.C.’s injuries were in various stages of healing.  Nevertheless, Anna continued to leave B.C. with Jason whenever she went to work.  Wolf testified that she told Anna never to let Jason care for B.C. again because it would not be safe.  Wolf further testified that her discussion with Anna indicated to her that Anna could not be protective of B.C. 

Sergeant Steve Benjamin, a police officer who also responded to the hospital to investigate the allegations of abuse, testified that he interviewed Anna that same night and that she provided a written statement about B.C.’s injuries.  In the statement, Anna reported that she had seen Jason slap B.C.’s leg and face, punch B.C. in the face with his fist, pull B.C.’s hair, and squeeze B.C. until he cried.  Anna stated that Jason had also hit her at least twice with an open hand and fist because she had gotten mad at him for not having a job and for the way he treated B.C.  Anna stated that she had noticed the marks on B.C.’s face three days earlier, when B.C. woke up in the morning after having spent the prior evening alone with Jason.  When Anna confronted Jason about the marks on B.C.’s face, Jason told her that B.C. had fallen while playing outside.  Anna told Jason that “those weren’t falling down marks” and accused Jason of hitting B.C., but Jason continued to deny hitting B.C., and Anna did not actually see Jason hit the child because she was at work while Jason babysat him.

Based on the results of the investigation, CPS removed B.C. from Anna’s custody that night and placed him in foster care.  Jason was charged with felony injury to a child with intent to cause bodily injury, to which he pleaded guilty and received ten years’ deferred adjudication community supervision. Anna gave birth to a girl, O.C., on January 18, 2005; CPS also removed her and placed her first with the Martinezes and then in foster care.  This case came to trial in May 2006.

At trial, both Anna and Jason gave testimony that was contrary to their prior admissions.  Anna testified that she had lied to the police about Jason’s abusing her and B.C. because she was scared that she might lose her son or go to jail.  Jason testified that he had caused only one bruise on B.C.’s left leg and that someone else must have caused B.C.’s other injuries.  He denied admitting to Juan that he caused B.C.’s bruises.

After hearing all the evidence, the trial court signed an order finding that termination of the parent-child relationship was in the best interests of the children and terminating Anna’s parental rights to B.C. and O.C. and Jason’s parental rights to O.C.  The order contains the trial court’s findings that Anna (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children and (2) knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children.  The order also contained the trial court’s findings that Jason (1) knowingly placed or knowingly allowed O.C. to remain in conditions or surroundings which endanger the physical or emotional well-being of the child and (2) engaged in conduct or knowingly placed O.C. with persons who engaged in conduct which endangers the physical or emotional well-being of the child.  Anna and Jason each challenge these findings on appeal.

DISCUSSION

A. Grounds for termination of Anna’s parental rights to B.C. and O.C.

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  T
EX.
 F
AM.
 C
ODE
 A
NN.
 § 161.001 (Vernon Supp. 2006); 
In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987). 

In her first two of three issues on appeal, Anna asserts that 
the evidence is legally and factually insufficient to support the trial court’s findings that she knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children
 and that she knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children.  
See 
Tex. Fam. Code Ann.
 § 161.001(1)(D)–(E)
.  Anna argues that the evidence was insufficient to show that she knew that leaving B.C. with Jason would endanger the child.  We disagree.

“Endanger” means to expose to loss or injury, to jeopardize.  
In re M.C.
, 917 S.W.2d 268, 269 (Tex. 1996).  Conduct of a person in the home can create an environment that endangers the physical and emotional well-being of a child under subsection (D).  
See In re W.S.
, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).  For example, abusive or violent conduct by a parent or other resident of a child’s home may produce an environment that endangers the physical or emotional well-being of a child.  
See id. 
at 776-77;  
Ziegler v. Tarrant County Child Welfare Unit
, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref’d n.r.e.).  Under subsection (E), the endangerment of the child’s well-being must be the direct result of the parent’s conduct, including acts, omissions, or failures to act.  
In re J.T.G.
, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)
.  Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  
Id.

Ample evidence was presented that the domestic violence between Jason and Anna, as well as ongoing violence against B.C. himself, created an endangering environment for B.C. in the home.  Lydia testified that Anna told Lydia in 2004 that Jason was hurting her, and she also told Lydia that Jason had bitten her on the cheek.  Based on B.C’s injuries, the ER doctor concluded that B.C. had suffered progressively worse injuries over the few days preceding his visit to the ER.  The CPS worker who responded to the hospital also testified that Anna told her she had seen Jason hit B.C. on an ongoing basis.  Anna herself told police that Jason had hit her at least twice with an open hand and fist and that she had seen Jason slap B.C.’s leg and face, punch B.C. in the face with his fist, and pull B.C.’s hair and squeeze him until he cried. Anna also admitted at trial that she saw bruising on B.C.’s leg the morning of the day that B.C. was taken to the hospital and that she was concerned for the child’s safety, but she nevertheless left B.C. with Jason while she went to work. 

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven.  
In re J.F.C.
, 96 S.W.3d 256, 265‒66 (Tex. 2002).
  We must review all the evidence in the light most favorable to the finding and judgment.  
Id.
 at 266.  This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so.  
Id.
  We must also disregard all evidence that a reasonable fact-finder could have disbelieved.  
Id.
  
We must consider, however, undisputed evidence even if it is contrary to the finding.  
Id.
  That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not.  
City of Keller v. Wilson
, 168 S.W.3d 802, 827 (Tex. 2005).

In a factual sufficiency review, in determining whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that its finding was true, we must consider whether the disputed evidence is such that a reasonable fact-finder could not have resolved it in favor of the finding.  
Id.
  If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  
Id.
 

Anna emphasizes that she recanted her previous statements during her trial testimony regarding Jason’s abuse of her and B.C., but it is the fact-finder’s duty to resolve issues of credibility; accordingly, the trial court could have properly determined that Anna’s recantation was not credible.  
See In re S.L.
, 188 S.W.3d 388, 394 (Tex. App.—Dallas 2006, no pet.); 
see also Golden Eagle Archery, Inc. v. Jackson
, 116 S.W.3d 757, 761 (Tex. 2003) (stating that the fact-finder “is the sole judge of the credibility of witnesses and the weight to be given to their testimony”).  

Anna also points to the absence of evidence such as prior police reports of family violence or a medical diagnosis of prior physical abuse to contend that the evidence is insufficient to support the trial court’s findings.  However, there was ample evidence from other sources, including Anna herself, of ongoing abuse suffered by Anna and B.C. at Jason’s hand; but despite this ongoing abuse, Anna continued to leave B.C. in Jason’s care.  Having reviewed the record, we conclude that the evidence is legally and factually sufficient to support the challenged endangerment findings.
(footnote: 5)  
See
 
Tex. Fam. Code Ann.
 § 161.001(1)(D)‒(E); 
In re J.F.C.
, 96 S.W.3d at 265‒66.  We overrule Anna’s first two issues.

B. Grounds for termination of Jason’s parental rights to O.C.

In his first two issues, Jason asserts that the evidence is legally and factually insufficient to support the trial court’s findings that he knowingly placed or knowingly allowed O.C. to remain in conditions or surroundings which endangered her physical or emotional well-being and that he engaged in conduct or knowingly placed O.C. with persons who engaged in conduct which endangered her physical or emotional well-being.
(footnote: 6)  Because CPS took O.C. into custody at birth, Jason argues, he never had possession of the child to perform any act having to do with endangering her well-being.  

However, as previously stated, a parent’s conduct with regard to the other parent or children can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.  
See In re W.J.H.
, 111 S.W.3d at 716; 
In re D.T.
, 34 S.W.3d at 636‒37.  Jason contends that the evidence is insufficient because evidence about almost every fact relating to his causing B.C.’s injury was controverted; however, it was the province of the trial court, as the fact-finder, to resolve conflicts within the evidence.  
See In re T.N.
, 180 S.W.3d 376, 382‒83 (Tex. App.—Amarillo 2005, no pet.).  The trial court could have freely chosen to believe all, part, or none of the testimony espoused by any particular witness.  
Id.
; 
see also In re R.W.
, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied) (stating that the fact-finder’s function “
is to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or inconsistencies in the testimony“). 

With regard to his treatment of B.C., Jason argues that the trial court should not have terminated his parental rights based upon “this one occurrence.“  Certainly, under the grounds contained in subsection (E)—engaging in conduct or knowingly placing the child with persons who engage in conduct which endanger her physical or emotional well-being—a deliberate course of endangering conduct by the parent is required.  
See In re J.T.G.
, 121 S.W.3d at 125.  The record contains much more evidence of abuse in addition to “this one occurrence,“ however; as detailed above, evidence was presented of domestic violence that Jason committed against Anna in addition to evidence showing that Jason’s abuse of B.C. was ongoing, not simply a one-time event.  

Jason also contends that termination was unwarranted because B.C.’s injuries were “limited to bruises” and no “significant injuries” were present. However, while the term “endanger” as used in the statute means more than a threat of “
metaphysical injury,“
 it is not necessary that the child actually suffers injury so long as the child is threatened with loss or injury or the child’s well-being is put in jeopardy due to the parent’s actions.  
See Boyd
, 727 S.W.2d at 533.  Furthermore, Jason pleaded guilty to the charge of felony injury to a child that was brought on the basis of such “insignificant” bruising, and the ER doctor observed that B.C. had apparently suffered progressively worse injuries over the days preceding the child’s visit to the ER.  Accordingly, we do not agree that the evidence is insufficient to support termination merely because B.C. did not suffer more “significant” injuries beyond the multiple bruises appearing on a large part of the one-year-old’s body.

Finally, Jason argues that, even assuming that he did injure B.C., the evidence is nevertheless insufficient to support termination of his rights to O.C. because no evidence was presented that he would have treated O.C., his biological child, in the same manner as B.C., his stepchild.  This argument fails because a parent’s conduct need not be directed at the child who is the subject of the termination proceedings or even result in injury to the child to constitute endangerment.  
See In re Baby Boy R.
, 191 S.W.3d 916, 925 (Tex. App.—Dallas 2006, pet. denied) (affirming trial court’s finding that defendant’s abuse of his stepdaughter constituted conduct that endangered the physical or emotional well-being of his unborn son) (citing 
Boyd
, 727 S.W.2d at 533), 
cert. denied
, 127 S. Ct. 729 (2006).  A parent’s conduct toward a stepchild will suffice to support termination of another child, even if that conduct did not occur in the child’s presence.  
Lucas v. Tex. Dep’t of Protective & Regulatory Servs
., 949 S.W.2d 500, 503 (Tex. App.—Waco 1997, pet. denied), 
disapproved on other grounds by In re J.F.C.
, 96 S.W.3d 256 (Tex. 2002); 
Trevino v. Tex. Dep’t of Protective & Regulatory Servs
., 893 S.W.2d 243, 248 (Tex. App.—Austin 1995, no writ).  

Having reviewed all the evidence, we conclude that the trial court could have reasonably resolved the disputed facts in favor of its finding and that 
the evidence is legally and factually sufficient to support the challenged endangerment findings.  
See
 
Tex. Fam. Code Ann.
 § 161.001(1)(D)‒(E); 
J.F.C.
, 96 S.W.3d at 265‒66.  We overrule Jason’s first two issues.

C. Best Interests of the Children

In their third issues, both Anna and Jason challenge the legal and factual sufficiency of the evidence supporting the trial court’s finding that termination of their parental rights was in the children’s best interests.  First, Appellants argue that the proposed placement—the foster home in which both children had lived for the past year—was unstable and presented a risk of physical and emotional harm.

About two months after O.C. was born, CPS placed her in the home of foster parent April Barlow.  Two months later, B.C. was also placed in the Barlow home.  At the time of trial, Barlow, along with her husband, had one ten-year-old adopted son and were in the process of adopting two other foster children, a two-year-old girl and a three-year-old boy.  Barlow testified that she and her husband wanted to adopt B.C. and O.C. as well.

Appellants point to B.C.’s behavioral issues, along with those of the other children in the home, in support of their argument that the foster home negatively affected the children’s emotional well-being and that the foster family was not making any progress in bonding with the children or meeting their physical and emotional needs.  Appellants claim that B.C. “began an emotional free-fall” after being placed with the Barlows, but Barlow testified that B.C. already “was lashing out with anybody” from the beginning; for example, on his first day in the foster home, B.C. bit one of the Barlows’ other children. 

However, under the care of the Barlows, B.C. was receiving speech, play, and occupational therapy services.  B.C. had bonded with his foster family to the point that he called the Barlows “mom” and “dad” and the other children in the home “brothers” and “sisters.”  O.C. as well had bonded with the foster family; Barlow testified that, because O.C. had lived with the family since she was “little bitty,” the Barlows were “mom and dad to her.”  O.C. was facing delays in her physical development, but she was also receiving physical therapy, and the Barlows worked with O.C. on a daily basis to perform exercises to improve her walking skills.

Jason contends that he had taken advantage of services provided by CPS to improve his parenting skills, and the record shows that, over a year after B.C.’s removal, Jason had just completed parenting classes and was attending anger management classes.  However, under the service plan developed by CPS, Jason was to complete a psychological evaluation, undergo individual counseling, and participate in batterers’ intervention services as well; there was no evidence that he had made any efforts to complete these services.  

As for Anna, a CPS conservatorship worker testified that she told Anna repeatedly that to create a safe environment for B.C., Anna needed to separate herself from Jason because he was the person who injured B.C. and he had not completed any services since B.C.’s removal.  Not only did Anna tell the conservatorship worker that she would not leave Jason because she did not believe that Jason caused B.C.’s injuries, she also went on to marry Jason in spite of the fact that he pleaded guilty to the charge of felony injury to a child—her son, B.C. She later filed for divorce but admitted at trial that she never intended to divorce Jason; instead, she initiated the divorce proceedings as a sham to regain custody of the children.

Considering the factors that the trier of fact in a termination case may use in determining the best interest of the child,
(footnote: 7) and reviewing the entire record from the termination trial, we conclude that the evidence 
is such that a fact-finder could reasonably form a firm belief or conviction that termination of Anna’s and Jason’s parental rights was in the children’s best interests
; therefore, we hold that the evidence was legally and factually sufficient to support the trial court’s best interest findings.  
See J.F.C.
, 96 S.W.3d at 
265‒66
. 
 We overrule Anna’s and Jason’s third issues.

CONCLUSION

Having overruled all three of Anna’s and Jason’s issues on appeal, we affirm the trial court’s judgment terminating Anna’
s parental rights to B.C. and O.C. and terminating Jason’
s parental rights to O.C.

PER CURIAM 

PANEL F: MCCOY, LIVINGSTON, and DAUPHINOT, JJ.

DELIVERED: March 29, 2007

FOOTNOTES
1:
See
 T
ex
. R. A
pp
. P. 47.4.   

2:
The trial court also terminated the parental rights of B.C.’s alleged father, Manuel Brajas.  Brajas did not appeal the trial court’s order, and his rights are not at issue in this appeal.

3:
Lydia Martinez and her husband, Juan, raised Anna from the age of six because Anna’s biological mother was a cocaine user and was living on the streets with Anna and her two sisters.  Anna’s mother was murdered when Anna was in the second or third grade.

4:
An ecchymosis is the escape of blood into the tissues from ruptured blood vessels marked by a black-and-blue or purple spot or area.  
Webster’s Third New International Dictionary 
718 (2002).

5:
Even though O.C. was not yet born at the time that B.C. was endangered, a parent’s conduct with regard to the other parent or children can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.  
See In re W.J.H.
, 111 S.W.3d 707, 716 (Tex. App.—Fort Worth 2003, pet. denied); 
see also In re D.T.
, 34 S.W.3d 625, 636‒37 (Tex. App.—Fort Worth 2000, pet. denied) (stating that evidence of conduct before child is born, as well as evidence as to how a parent has treated another child or spouse, is relevant regarding whether a course of conduct under section 161.001(1)(E) has been established). 

6:
We disagree with the State’s contention that Jason forfeited these complaints because his statement of points of appeal was insufficiently specific.  Jason’s statement of points specifically challenged the legal and factual sufficiency of the evidence to support these two findings of the trial court, which was enough to allow the trial judge to correct any erroneous findings on the challenged grounds and to preserve these complaints for appeal.  
See In re A.J.H
., 205 S.W.3d 79, 80‒81 (Tex. App.—Fort Worth 2006, no pet.).

7:
See
 
Holley v. Adams
, 544 S.W.2d 367, 371‒72 (Tex. 1976).